# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

LISA BOGGESS, KIM BUTTSHAW,
And DRAKE L. BOGGESS,

        Plaintiffs,

vs.

CITY OF WATERLOO and KENNETH
SCHAAF,

        Defendants.

No.  C23-2057-LTS-MAR

**MEMORANDUM
OPINION AND ORDER**

## I.    INTRODUCTION

This matter is before me on (1) a motion (Doc. 61) for partial summary judgment filed by plaintiffs Lisa Boggess, as Administrator of the Estate of Brent Boggess, and as next friend to Z.A.B. and J.L.B.; Kim Buttshaw and Drake Boggess; (2) a motion (Doc. 64) for summary judgment filed by defendants City of Waterloo and Kenneth Schaaf; (3) a motion (Doc. 71) to strike defendants' expert opinion testimony filed by plaintiffs and (4) a motion (Doc. 75) to exclude plaintiffs' expert witness filed by defendants. Defendants have filed resistances to plaintiffs' motions, *see* Docs. 65, 74, and plaintiffs have filed a reply (Doc. 72) in support of their motion for partial summary judgment. Plaintiffs have also filed resistances to defendants' motions, *see* Docs. 69, 78, and defendants have filed replies (Docs. 73, 79).  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

On November 13, 2022, plaintiffs commenced this action in the Iowa District Court for Black Hawk County.  On June 28, 2023, they amended their petition to include

a claim under 42 U.S.C. § 1983. On July 7, 2023, defendants filed a notice (Doc. 1) of removal based on federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs filed an amended petition (Doc. 5) on July 10, 2023, a first [sic] amended complaint (Doc. 28)[1] on August 31, 2023, a second amended complaint (Doc. 46) on January 9, 2024, and a fourth amended complaint (Doc. 56) on April 19, 2024. The fourth amended complaint alleges the following claims:

- Count I – Use of excessive force in violation of the Fourth Amendment to the United States Constitution
- Count II – Assault under Iowa common law and as protected by Article I, section 8 of the Iowa Constitution
- Count III – Battery under Iowa common law and as protected by Article I, section 8 of the Iowa Constitution
- Count IV – Wrongful use of deadly force by a law enforcement officer as expressly provided by statute and protected by Article I, section 8 of the Iowa Constitution

Doc. 56. Defendants filed answers (Docs. 57, 58) denying the allegations and asserting affirmative defenses including qualified immunity and immunity under Iowa Code §§ 804, 670.4 and 670.12. Trial is scheduled to begin January 27, 2025.

### III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving

---

[1] This should have been labeled a second amended complaint and the second amended complaint labeled a third amended complaint.

party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof,

then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998).

## IV.    RELEVANT FACTS

The following facts relevant to defendants' motion for summary judgment are undisputed unless otherwise noted. In the early morning hours of November 16, 2021, Officer Connor Weber of the Waterloo Police Department radioed that a man later identified as Brent Boggess attempted to strike him with his truck.[2] Doc. 69-2 at 1. Weber then followed Boggess and activated his emergency lights while Boggess was at a stop sign. *Id.* at 2. Defendants assert Boggess reversed his truck and accelerated towards Weber while plaintiffs deny that Boggess attempted to hit Weber. *Id. See* Def. Ex. R.

---

[2] Plaintiffs note that Weber's dash camera footage shows that Boggess did not attempt to strike Weber. Doc. 69-2 at 1. The video evidence, *see* Def. Ex. R, shows that Weber pulled into a driveway as headlights approached him. It also appears that Weber had been parked at an angle in the residential street such that he was blocking most of the roadway.

The parties also dispute whether Schaaf heard Weber say "he's gonna hit me" over the radio. *Id.* Boggess drove away and Weber followed him with his emergency lights and siren activated. *Id.* Boggess drove off-road and into a yard. *Id.* Weber drove past and stopped along his right side of the road facing Boggess. *Id.* Boggess got back on the road driving on the wrong side. *Id.* The parties dispute whether Boggess "buzzed" Weber's front bumper as he did so. *Id.* The parties dispute whether Schaaf heard Weber state over the radio "he's coming head on to me." *Id.* at 3. *See* Def. Ex. R.[3]

Multiple officers responded to Weber's radio call. *Id.* The officers pursuing Boggess were driving marked squad cars with their emergency lights activated and some using sirens as well. *Id.* Schaaf responded with both his emergency lights and siren. *Id.* Officer Jesse Aitchison approached Boggess with his emergency lights activated, shined a spotlight on Boggess and ordered Boggess to show his hands. *Id.* at 4. Boggess shouted something back at Aitchison and began to drive away. *Id.* Boggess then reversed his vehicle and accelerated towards Aitchison. *Id.* Aitchison reversed his squad car. The parties dispute whether he had to do this to avoid an impact from Boggess' truck. *Id.* The parties dispute whether Schaaf heard Aitchison report that Boggess was backing up like he was going to hit his squad car. *Id.* Boggess stopped, then accelerated forward, fishtailing and spraying gravel behind him. *Id.*

Boggess then drove his truck off-road into a waterway. *Id.* at 5. The parties dispute whether Schaaf heard radio reports regarding Boggess driving through the waterway but agree that Schaaf also proceeded through the waterway. Schaaf and Boggess had an interaction in which Schaaf was outside of his car. Plaintiffs deny that Schaaf communicated with Boggess and note that Boggess was in a position to strike Schaaf or a police vehicle and made no effort to do so. *Id.*

---

[3] The dash camera footage shows that Weber again moved his vehicle out of the way as Boggess' vehicle approached him.

Boggess then drove his truck off-road to avoid a roadblock of multiple squad cars. *Id.* at 6. The parties dispute the extent of bystanders on the streets near the pursuit. Defendants state there were multiple bystanders, while plaintiffs note that Schaaf observed "two people on Arizona St." *Id.* Schaaf observed Boggess "sideswipe" a parked car. *Id.*

Boggess then drove into the alley behind 220 Madison Street. Officer Luke Lamere followed Boggess into the alley. Sergeant Joe Zubak had placed stop sticks on the ground and Boggess stopped his truck short of the stop sticks. *Id.* Lamere parked his squad car several feet behind Boggess' truck. Zubak and Officer Kyle Ullom were on foot in the alley and tried to speak and reason with Boggess through his open driver's-side window. *Id.* Boggess then accelerated in reverse towards Lamere's vehicle. Zubak yelled "stop" but the parties dispute whether this was directed at Boggess or Officer Nick Weber.

Nick Weber drove his squad car down the alley towards Boggess and stopped several feet in front of Boggess' truck. *Id.* at 7. Plaintiffs note that Weber ignored Zubak's order to stop, ran over the stop sticks in an aggressive manner as if he was going to strike Boggess' truck head-on and only then stopped several feet in front of Boggess' truck. Meanwhile, Schaaf approached the alley on foot. Schaaf saw Boggess put his truck in drive and assume a posture he interpreted as bracing for impact. *Id.* at 8. Plaintiffs deny Schaaf's assessment of Boggess' posture. Boggess accelerated his truck forward. The parties dispute whether he sprayed gravel or dirt behind him as he did so. *Id.* at 8. Boggess drove head-on at Weber's squad car with Weber still inside. *Id.* Plaintiffs note Boggess' vehicle reached a "top speed of 8 mph before colliding with

Weber's vehicle."[4]  *Id.*  As Boggess accelerated forward, Schaaf perceived Weber getting out of his squad car.[5]  *Id.*  Boggess' truck collided with Weber's squad car head-on.

Boggess' truck remained operational after the impact.  The parties dispute whether the tires continued to spray gravel or dirt after the impact or whether they stopped.  Schaaf fired six rounds at Boggess in rapid succession after the impact.  *Id.* at 9.  Defendants state Schaaf stopped firing his service weapon when he perceived that Boggess no longer posed an immediate threat, leaving 12 rounds in his magazine.  Plaintiffs deny that Boggess was an imminent threat of serious bodily injury or death to anyone at the time Schaaf fired.  Multiple rounds struck Boggess resulting in his death.  *Id.*

## V.    ANALYSIS

### A.    *Defendants' Motion for Summary Judgment*[6]

Defendants seek summary judgment on the § 1983 claim based on qualified immunity.  The City argues it is not vicariously liable because Schaaf acted reasonably and it cannot be liable under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Additionally, defendants argue plaintiffs' state law tort claims have no merit because Schaaf's use of force was objectively reasonable, they have qualified immunity and the City retains governmental immunity from tort claims.

---

[4] This is based on a report from defendants' expert.  *See* Doc. 71-2 at 19.  While plaintiffs seek to exclude this report, they rely on this conclusion in resisting defendants' motion for summary judgment.  *See* Doc. 69-1 at 4, 12.

[5] Plaintiffs admit that Schaaf made this claim but deny that any objectively reasonable officer would share this perception.

[6] While the parties have filed motions to exclude each other's expert reports, I do not find it necessary to address those motions as part of the summary judgment analysis, as defendants do not rely on their expert reports except as to a shooting timeline from Zubak's body worn camera, which is not essential to the analysis.  *See* Doc. 64-1 at 12.  Nor do plaintiffs rely on their expert report in responding to defendants' motion for summary judgment.

### 1. Qualified Immunity

#### a. Parties' Arguments

Defendants argue they are entitled to qualified immunity because Schaaf's use of force was objectively reasonable under the circumstances.[7]  Defendants rely on *Hernandez v. Jarman*, 340 F.3d 617, 624 (8th Cir. 2003) to argue that an officer reasonably uses deadly force when a suspect flees from police, evades roadblocks and drives head-on into an occupied squad car.  They argue the reasonableness of such force is further supported when the officer knows that the suspect has attempted to strike officers with his vehicle.  *See* Doc. 64-1 at 8-9 (citing *Cole v. Bone*, 993 F.2d 1328, 1333-34 (8th Cir. 1993)).  Defendants argue Schaaf had knowledge of the circumstances of the pursuit, which informed his decision to use deadly force when he saw Boggess accelerate toward Nick Weber in his cruiser.

Plaintiffs argue defendants are not entitled to qualified immunity because no objectively reasonable officer would have believed Weber exited his cruiser and was in jeopardy of serious bodily injury in the split second between running over the stop sticks and the low-speed collision with Boggess' truck.  They contend there was not otherwise any threat of bodily harm that would justify the use of deadly force.  They assert the law was clearly established that unreasonable mistakes of fact are not protected by qualified immunity.

#### b. Legal Standards

Qualified immunity shields a government official from individual liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

---

[7] In arguing defendants (plural) are entitled to qualified immunity, defendants rely on *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) (noting that without a constitutional violation by an individual officer, there can be no § 1983 or *Monell* failure to train municipal liability).

8

(1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004). "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis*, 375 F.3d at 711-12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). To determine whether a defendant is entitled to qualified immunity, courts ask (1) whether the facts alleged or shown establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unless the answer to both of these questions is yes, a defendant is entitled to qualified immunity. *See Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013).

"For a right to be 'clearly established,' the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Stated another way, its "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted). "A plaintiff need not cite a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must have put the statutory or constitutional question beyond debate as of the date of the alleged violation." *Hamner*, 937 F.3d at 1177 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (internal quotations omitted)).

### c. *Violation of a Constitutional Right*

The Eighth Circuit recently summarized the following standards related to use of force in the context of a police chase:

9

Claims against local police for excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard. To determine the reasonableness of a seizure under the Fourth Amendment standard, we weigh the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade by flight. We have consistently held deadly force is not unreasonable where an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others. Specific to police chases, the Supreme Court has held, [a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

*Lankford v. City of Plumerville, Ark.*, 42 F.4th 918, 921 (8th Cir. 2022) (internal quotations and citations omitted). If a suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

The issue presented here is whether Schaaf had probable cause to believe that Boggess posed a threat of serious physical harm to Nick Weber or other officers on the scene. As an initial matter, the parties dispute whether the collective knowledge doctrine may be considered as part of the relevant context of the reasonableness of an officer's use of force. That doctrine, typically used in the context of search and seizure cases, "imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold 'an otherwise invalid search or seizure.'" *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001). The Eighth Circuit has acknowledged that while it has not applied the collective knowledge doctrine to justify use of deadly force, "it is rooted in the principle that officers may reasonably rely on the information and judgment of other officers" and "an officer is ordinarily reasonable in relying on the veracity of dispatch's relay of such information." *Lankford*, 42 F.4th at 922 n.3. In *Lankford*, the court concluded that the seizing officer "in a tense and time-sensitive situation, reasonably relied on the judgment of fellow police officers as he understood it

10

through dispatch's report" in setting up a roadblock. *Id.* at 922. Similarly, I find Schaaf could have reasonably relied on dispatch reports in responding to the situation.

Schaaf's knowledge, including collective knowledge, prior to responding to the scene is disputed, mostly because plaintiffs deny that evidence cited by defendants establishes that Schaaf heard radio reports or made certain observations. For instance, plaintiffs deny that the evidence cited by defendants (radio dash camera footage from Connor Weber and Schaaf's vehicles) establishes that Schaaf heard Weber state "he's gonna hit me." While I agree that that evidence does not necessarily establish that Schaaf heard Weber's statement, other evidence in the record does. Schaaf testified by deposition that he heard Weber radio that a car had just tried to hit him. Doc. 64-3 at 34. Schaaf testified he responded by turning on his lights and siren and traveling in that direction. *Id.* He was the third police car behind Boggess and testified it was not a high-speed chase. *Id.* at 35.

Schaaf also testified that he witnessed Boggess sideswipe a car parked on Arizona Street as he was traveling approximately 30 miles per hour. *Id.* at 41. As noted by plaintiffs, Schaaf had also encountered Boggess at his house, at which time Boggess did not attempt to strike Schaaf (who was on foot) or any of the police cars at that time. *Id.* at 39-40. This testimony from Schaaf is the best evidence of what he knew about the pursuit prior to approaching the alley. In any event, I must evaluate the reasonableness of Schaaf's conduct by looking at the threat present at the time he used deadly force. *See Gardner v. Buerger*, 82 F.3d 248, 253 (8th Cir. 1996) ("[W]e focus on the seizure itself – here, the shooting – and not on the events leading up to it.").

Defendants argue Schaaf's use of force was objectively reasonable based on his knowledge of the circumstances of pursuit when he saw Boggess accelerate towards Weber in his cruiser. Doc. 64-1 at 9 (citing *Hernandez*, 340 F.3d at 620). In *Hernandez*, police were pursuing a driver whom they suspected was under the influence. *Hernandez*, 340 F.3d at 620. Multiple officers were involved in the high-speed chase and the driver evaded roadblocks and other attempts to stop him before driving into a field, at which

11

point he turned around and drove his vehicle head-on towards a police vehicle. *Id.* at 621. One officer jumped out with a shotgun while another remained inside the vehicle when the driver struck it head-on. *Id.* The officer with the shotgun perceived the driver back up and turn towards him, which the officer believed was in preparation to run him over. He fatally shot the driver. *Id.* The Eighth Circuit concluded this use of force was objectively reasonable and the officer was entitled to qualified immunity. *Id.* at 624.

Plaintiffs distinguish *Hernandez*, noting there was no prolonged high-speed chase here, the pursuit was over when Boggess was blocked in the alley behind his house and he was not driving his pickup at any officer (on foot) at the time he was shot. Specifically, they argue no objectively reasonable officer could have believed that Weber got out of his cruiser and was at risk from Boggess' truck at the time Schaaf used deadly force. They contend that defendants otherwise rely on impermissible speculation as to further actions Boggess could have taken to justify Schaaf's actions.

I agree with plaintiffs that *Hernandez* is distinguishable. Notably, in that case the officers did not deploy deadly force at the time the driver drove head-on towards a police vehicle or when he struck the vehicle with an officer inside. It was only after the driver reversed and began heading towards the officer on foot that the officer who was in danger used deadly force. Here, Schaaf purportedly used deadly force because he perceived Weber was exiting his vehicle as Boggess accelerated toward him and deadly force was applied after Boggess' truck impacted the front of Weber's cruiser.

Plaintiffs argue it was objectively unreasonable for Schaaf to perceive that Weber had exited in the vehicle in the short time between his driving over the stop sticks and Schaaf firing his weapon. They base this argument on Zubak's and Ullom's actions, as neither of them had their gun drawn, nor did they fire at Boggess, as his vehicle accelerated forward colliding with Weber's vehicle. Because these officers did not believe the use of deadly force was necessary to defend themselves or anyone else from bodily harm, they argue it was unreasonable for Schaaf to use deadly force under the circumstances.

12

This argument is flawed for at least two reasons. First, the analysis must be based on the viewpoint of the officer using force. *See Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) ("What is objectively reasonable under the particular circumstances is evaluated from the perspective of a reasonable officer on the scene and turns on those facts known to the officer at the precise moment he effectuated the seizure.") (internal quotations and citations omitted). Second, even if I could consider Zubak's and Ullom's perspectives, their perspectives were significantly different than Schaaf's, as they were on the passenger side of Weber's vehicle and on a downward slope such that it would have been difficult to view the driver's side of Weber's vehicle. *See* Def Exs. E, H. Schaaf, on the other hand, was on an upward slope on the driver's side of Weber's vehicle. Thus, he had the better vantage point for determining whether Weber was at risk of serious bodily harm. In any event, while the video evidence seems to confirm that Weber did not exit his vehicle at any time before the shots were fired, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Plaintiffs argue it was not objectively reasonable for Schaaf to perceive that Weber was exiting his vehicle at the time Boggess began accelerating towards him "for no other reason[] than it wasn't physically possible." Doc. 69-1 at 7.[8] Because I must view the facts in the light most favorable to plaintiffs, I will assume for purposes of this motion that Weber remained in his vehicle immediately after driving over the stop sticks and

---

[8] Plaintiffs cite the report of defense expert Jason Fries (which they seek to exclude) but do not explain how that report supports their position. The page they cite includes a "Shooting Timeline (From Zubak BWC), which is also cited by defendants. *See* Docs. 71-2 at 18, 64-1 at 12.

through the time Schaaf fired his weapon and that it was objectively unreasonable for Schaaf to perceive otherwise. Still, I must consider the severity of the crime at issue, whether Boggess posed an immediate threat to the safety of the officer or others, and whether he was actively resisting arrest or attempting to evade by flight. *See Lankford*, 42 F.4th at 921.

Defendants argue the use of deadly force was objectively reasonable based on the totality of the circumstances including the chase, the evasion of roadblocks, confrontation and the impending head-on collision. They cite *Sanders v. City of Minneapolis*, 474 F.3d 523, 525 (8th Cir. 2007), and *Wilkinson v. Torres*, 610 F.3d 546, 548 (9th Cir. 2010). In *Sanders*, Alfred Sanders was driving erratically for approximately 15 to 20 minutes before pulling into an alley and into an adjacent parking spot. A security officer parked in the middle of the alley and stood by his vehicle waiting for other officers to arrive. Other officers entered the opposite end of the alley and exited their vehicles. As one officer approached Sanders' vehicle, Sanders put his car in reverse and backed into the security officer's vehicle next to where the security officer stood. Sanders then put the vehicle in drive and accelerated down the alley towards the officers who were on foot. An officer a few feet in front of Sanders' car fired two shots as the vehicle drove toward him. Another officer, believing that the shooting officer had been trapped under Sanders' car, also fired her weapon at him. *Sanders*, 474 F.3d at 525. Sanders continued down the alley with each officer firing at his car as it passed them until it collided with one of the squad cars. The Eighth Circuit concluded that the plaintiff had provided no admissible evidence to contradict the officers' testimony that each believed Sanders was trying to run over officers and "[g]iven the quickly evolving scenario, the officers' actions in shooting [Sanders] in an attempt to stop him from injuring the officers in his path were objectively reasonable and did not violate [Sanders'] Fourth Amendment right to be free from unreasonable seizures." *Id.* at 526.

In *Wilkinson*, officers pursued a suspect driving a stolen minivan. *Wilkinson*, 610 F.3d at 548. They performed two Pursuit Immobilization Technique (PIT) maneuvers

14

on the minivan but the driver managed to gain control after each and proceeded at a moderate speed – five to ten miles per hour over the speed limit. After a sheriff positioned his car to block the minivan's path, the minivan hit a telephone pole and came to a stop. Officers got out of their patrol cars and approached the minivan on foot. As one officer was opening the driver-side door, the minivan reversed and began spinning its tires. The officer jumped out of the way to avoid being hit. Believing that the officer had been run over, a second officer began shooting through the passenger-side window as the minivan continued to back up. After reassessing the situation, the officer continued shooting as the minivan continued to arc around him before it eventually straightened out and slowed down. *Id.* at 549.

The Ninth Circuit concluded the shooting officer did not violate a constitutional right because he had probable cause to believe that the driver posed an immediate threat to the safety of the officers. *Id.* at 551. Specifically, the court cited the fact that the officer was standing in a slippery yard with a minivan accelerating around him, the driver of the minivan had failed to yield to police sirens and direct commands to put his hands up and stop the vehicle. The minivan continued accelerating with its tires spinning and mud flying up and a fellow officer was nearby either fallen on the ground or standing but disoriented. *Id.* The court stated: "The situation had quickly turned from one involving a crashed vehicle to one in which the driver of a moving vehicle, ignoring police commands, attempted to accelerate within close quarters of two officers on foot." *Id.* While plaintiffs argued that the officer who had fallen was out of harm's way at the time of the shooting, the court noted that the critical inquiry was what the shooting officer perceived, which was that the officer had fallen and had possibly been run over and was worried the van would arc back around and toward him. *Id.*

There are substantial differences between the circumstances of those cases and the instant case. The most relevant is that the officers in harm's way in *Sanders* and *Wilkinson* were on foot, whereas the officer who was most-obviously in harm's way here was in his police cruiser, which he had purposefully positioned directly in front of

15

Boggess' vehicle to block his further escape. While other officers were nearby on foot, there is nothing beyond speculation to suggest they were at risk of immediate harm prior to Schaaf deploying deadly force.

The other major difference is the movement of the suspect's vehicle just prior to the use of force. In *Sanders*, the suspect was able to travel down the alley far enough that he passed multiple officers. *Sanders*, 474 F.3d at 526. In *Wilkinson*, the suspect was able to accelerate around officers in a yard. *Wilkinson*, 610 F.3d at 549. Here, Boggess had only a few feet ahead of him before striking Weber's vehicle. While one could speculate about whether Boggess could have maneuvered around Weber's vehicle, there is nothing to indicate he made any attempt at such a path, potentially jeopardizing other officers' safety. Finally, Schaaf deployed deadly force after Boggess had hit Weber's vehicle and come to a stop.[9] The similarities – the pursuit, ignoring commands and confrontation – are less relevant than the actions that took place immediately before the application of deadly force, including the perceived threats of serious bodily injury.

Other factors, including the severity of the crime at issue and whether Boggess was actively attempting to evade by flight, add little to the reasonableness of deadly force. The crime at issue is the apparent attempt to strike Connor Weber's police vehicle. While a serious crime, Boggess did not actually hit Connor Weber's vehicle or any other police vehicle he encountered during the low-speed chase. The chase itself presented the most danger as Boggess drove through residential neighborhoods, hit a parked car and drove through yards. As to evasion by flight, it was reasonable to assume that Boggess was attempting to evade officers when he accelerated towards Weber's vehicle. At the same time, there is little to suggest Boggess would have been successful in that effort without

---

[9] While Schaaf may have made the decision to shoot prior to the actual collision, as opined by defense expert Fries, *see* Doc. 64-3 at 150, Weber's vehicle presented a significant roadblock to any path of escape Boggess may have attempted.

use of deadly force given the position of his vehicle between fences and retaining walls and surrounded by police vehicles.

Plaintiffs have come forward with sufficient evidence from which a reasonable jury could conclude Schaaf violated Boggess' constitutional right to be free from unreasonable seizure by using deadly force under these circumstances. Based on the totality of the circumstances including the low-speed chase, the lack of any indication that Boggess was armed or had committed a serious crime,[10] the position of Boggess' vehicle surrounded by law enforcement in the alley and that his vehicle had come to a stop immediately before the use of deadly force, a reasonable jury could conclude that deadly force was objectively unreasonable as there was no risk of serious bodily injury to anyone on the scene.[11]

### d.     *Whether the Right was Clearly Established*

A constitutional violation is only one part of the qualified immunity analysis. The other part requires plaintiffs to demonstrate it was clearly established that the officer's actions violated the law. *See Est. of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) ("The plaintiffs have the burden of showing that the law was clearly established."). "This generally requires a plaintiff to point to existing circuit precedent that involves

_____

[10]   As mentioned above, the parties indicate that the chase ensued after Boggess attempted to strike Connor Weber's vehicle. It is unclear whether this was the impetus for attempting to stop Boggess' vehicle or whether there was some other crime or infraction police were investigating. In any event, aside from attempting to strike a police vehicle and failing to stop for law enforcement, the crimes at issue were limited to traffic violations including hitting a parked vehicle and driving off the road, all of which occurred immediately prior to or during the pursuit. There is no indication in the record that Boggess was suspected of any other serious crime.

[11] Whether there was a constitutional violation is also the subject of plaintiffs' motion for partial summary judgment. *See* Doc. 61-1. While that motion may be denied on the basis of qualified immunity, as discussed herein, I would also deny it on grounds that a reasonable jury could conclude that the use of force was reasonable when viewing the facts in the light most favorable to defendants, including Schaaf's perception that Weber was exiting his vehicle as Boggess was accelerating towards him.

17

sufficiently similar facts to squarely govern the officer['s] conduct in the specific circumstances at issue." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021) (internal quotations omitted).

Plaintiffs rely on *Molina-Gomes v. Welinski*, 676 F.3d 1149 (8th Cir. 2012), and *Lewis v. Charter Township of Flint and Needham*, 660 F. App'x 339 (6th Cir. 2016). In *Molina-Gomes*, an undercover officer was speaking with the suspect through a rear window of the car when the suspect began to drive forward. In the meantime, other officers had driven their vehicles behind and in front of the suspect's vehicle to prevent him from driving off. The undercover officer opened the driver's door and ordered the suspect to get out. The suspect reversed his vehicle, knocking the undercover officer to the ground and then attempted to drive around the law enforcement vehicle in front of him. As he tried to escape, the officer in the front vehicle got out of his car and fired eight shots at the suspect's car. *Molina-Gomes*, 676 F.3d at 1151. The district court found the officer was entitled to qualified immunity and the Eighth Circuit agreed:

> We conclude that Sergeant Welinski's use of deadly force did not violate Molina Campos's constitutional rights. The reckless driving by Molina Campos in his attempt to escape was a danger to the arresting police officers and to any drivers on the roadway. When Molina Campos sped backwards, he dragged the undercover officer along, knocking him to the ground. He then crashed into a police vehicle before driving around Welinski's vehicle towards county road 34. At the time Welinski fired his weapon he had probable cause to believe that Molina Campos posed a threat of serious danger to the officers as well as to other motorists.

*Id*. at 1152-53. Plaintiffs argue the facts of this case do not rise to the level of danger presented in *Molina-Gomes* because the precursor chase would have had to be at a high speed, rather than under 10 miles per hour; an officer would have to have been hit by Boggess with enough force for a window to shatter; another officer would have had to

believe that the hit officer was dead; [12] another officer would have had to be in the direct path of Boggess' truck at the time shots were fired rather than to the side of the vehicle and Boggess would have had to be in a position where he could have maneuvered his truck into traffic.

*Molina-Gomes* does not clearly establish that any particular action by law enforcement violates a constitutional right. Indeed, the district court found that the officer in that case was entitled to qualified immunity because there was no violation of a constitutional right and did not even address whether the right was clearly established but acknowledged the facts fell within the "hazy border between acceptable and excessive force since Welinski reasonably believed Campos posed a substantial risk of danger to others and the record supports that belief." *Molina-Gomes*, 2011 WL 13187418, at *5. One could fairly interpret *Molina-Gomes* as *supporting* qualified immunity in this case, as the suspect used his vehicle to hit an officer, which is precisely what Schaaf perceived Boggess was about to do when he began accelerating toward Weber's vehicle. Even if Weber had remained in his vehicle, plaintiffs have not cited any law clearly establishing that that distinction makes a difference. Plaintiffs' suggestion that the circumstances must rise to the level presented in *Molina-Gomes* in order for Schaaf to be entitled to qualified immunity is not the law. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established."). *Molina-Gomes* fails to establish, let alone clearly, that Schaaf's actions violated a constitutional right.

*Lewis* also fails to demonstrate the constitutional right in this case was clearly established at the time Schaaf fired his service weapon. First, *Lewis* is not precedential,

---

[12] These were facts discussed by the district court. *See Molina-Gomes v. Welinski*, Civil No. 09-3707, 2011 WL 13187418, at *2 (D. Minn. May 25, 2011) ("Campos put his car in reverse and accelerated at a high rate of speed, hitting [the officer] with the car's door. The window of the driver's door shattered and [the officer] flew backward into the vehicle of another Task Force member who was trying to block Campos. At the time, Welinski believed that [the officer] had been killed by the force of the impact.").

as it is outside of the Eighth Circuit.  Second, it involves different factual circumstances regarding the officer's perception of imminent harm.  In *Lewis*, the passenger of a stopped vehicle, Dominique Lewis, climbed into the driver's seat during a pat-down search of another passenger.  *Lewis*, 660 F. App'x at 341.  As he started the vehicle, the officer conducting the pat-down ran across the front of the vehicle, stopping directly in front of the driver's side and appeared to have his gun drawn and pointed at Lewis.  *Id.*  Lewis accelerated the vehicle forward while the officer moved a few steps to his right to get out of the vehicle's path.  While the vehicle came close to the officer, it did not hit him.  As the vehicle passed the officer, he shot into the driver's side window.  Lewis died of the gunshot wounds.  *Id.*

The Sixth Circuit concluded the officer was not entitled to qualified immunity. When viewing the facts in the light most favorable to plaintiffs, the court concluded that Lewis, who was not suspected of any violent crime, was merely trying to flee a traffic stop in a vehicle, which was insufficient to justify the use of deadly force.  *Id.* at 343.  It noted the video did not clearly show that Lewis "targeted" the officer when he accelerated the vehicle and attempted to flee.  *See id.* ("Because [the officer] ran in front of the vehicle after Lewis had started the ignition and less than a second before he accelerated forward, it is not clear from the video that a reasonable officer would have perceived that Lewis was 'targeting' him.").  With regard to whether Lewis' rights were clearly established, the court relied on "longstanding precedent that it is unreasonable for an officer to use deadly force against a suspect merely because he is fleeing arrest; rather, such force is only reasonable if the fleeing suspect presents an imminent danger to the officer or others in the vicinity."  *Id.*  Viewing the facts in the light most favorable to plaintiff, the court noted that a reasonable officer would not have perceived *any* imminent threat to himself or others and that officers have fair warning based on Supreme Court precedent that they may not use deadly force against a fleeing suspect where that person presents no imminent danger to the officer or others in the area.  *Id.* at 347 (emphasis in

original). The court also relied on circuit precedent addressing similar factual circumstances as clearly establishing the right at issue in *Lewis*.

The clearly established right in *Lewis* does not apply here because Schaaf perceived that Boggess presented an imminent threat to Weber, observing that Boggess "braced" for impact and accelerated towards Weber. Even if it was objectively unreasonable for Schaaf to believe that Weber had exited his vehicle or that Boggess could gain enough speed to inflict serious bodily injury, Boggess appeared to be "targeting" Weber (in or outside his vehicle) unlike the decedent in *Lewis*. Whether the threat had passed at the time Schaaf fired his weapon is also not as clear as it was in *Lewis*. While it is undisputed that Boggess hit Weber's vehicle immediately before Schaaf fired his weapon, the threat in *Lewis* had physically passed (such that the officer was on the side of the vehicle) whereas Schaaf's position in relation to Boggess' vehicle made it more difficult for him to make that determination, particularly because he was not the one in danger.

Plaintiffs have cited no other precedent demonstrating it was clearly established that it was objectively unreasonable for an officer to use deadly force under these circumstances at the time Schaaf fired his weapon. When viewing the facts in the light most favorable to plaintiffs, Weber remained in his vehicle at the time Boggess accelerated towards him. Plaintiffs have cited no case law clearly establishing that an officer may not use deadly force against a driver who accelerates head on toward an occupied police vehicle, even from a short distance away, and with the knowledge of the events that led up to that moment. To the contrary, the Supreme Court has recognized that an officer did *not* violate clearly established law by firing at a fleeing vehicle to prevent possible harm to "occupied vehicles in [the driver's] path," as well as other officers on foot whom she believed were in the immediate area and other citizens who might have been in the area. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam). Without identifying clearly established law, such that Schaaf was on notice at the time that his actions violated Boggess' constitutional rights, plaintiffs have failed as a

21

matter of law to show that Schaaf is not entitled to qualified immunity. As such, Schaaf is entitled to summary judgment on plaintiffs' § 1983 claim.

### 2. Claims Against the City

Because Schaaf is entitled to qualified immunity, plaintiffs' claim against the City also fails. *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim" (citation omitted)). Even if Schaaf was not entitled to qualified immunity, Boggess has failed to present evidence of any official policy or custom that would lead to the City's liability for Schaaf's actions. *See Monell*, 436 U.S. at 694.

### 3. State Law Tort Claims

Plaintiffs have asserted claims of assault and battery under Iowa common law and wrongful use of deadly force by a law enforcement officer under Iowa Code §§ 704, 804.8. They allege that each of these claims is protected by Article I, section 8 of the Iowa Constitution. As noted by defendants, these quasi-constitutional tort claims differ slightly from ones arising directly under the Iowa Constitution that were abolished in *Burnett v. Smith*, 990 N.W.2d 289, 307 (Iowa 2023). Nonetheless, defendants argue that each of these fails because Schaaf's use of force was objectively reasonable, defendants have qualified immunity under Iowa Code § 670.4A[13] and the City retains governmental immunity from tort claims under Iowa Code § 670.7(2).

---

[13] This statute provides that "an employee or officer subject to a claim brought under this chapter shall not be liable for monetary damages if . . . [t]he right, privilege, or immunity secured by law was not clearly established at the time of the alleged deprivation, or at the time of the alleged deprivation the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law."

Plaintiffs argue the immunities identified by defendants cannot defeat claims that are protected by the Iowa Constitution. They rely on Justice McDonald's concurrence in *Lennette v. State*, 975 N.W.2d 380, 402-03 (Iowa 2022), as well as the Iowa Supreme Court's subsequent decision *White v. Harkrider*, 990 N.W.2d 647, 656 (Iowa 2023), to argue that their assault and battery claims remain viable after *Burnett* and that there is, at minimum, a fact issue regarding whether Schaaf committed an assault and battery on Boggess without justification. In *Klum v. City of Davenport*, No. 3:23-CV-00043, 2024 WL 2880640, at *12, n.3 (S.D. Iowa May 30, 2024), the Southern District rejected the premise that *White* stands for the proposition that qualified immunity cannot apply to assault and battery claims allegedly protected by the Iowa Constitution. *Klum*, 2024 WL 2880640, at *12, n.3. While the *Klum* court did not recognize plaintiffs' claims of assault, battery and a violation of Iowa Code ch. 704 and § 804.8,[14] it stated that even if it did recognize such claims, defendants would be entitled to summary judgment based on its conclusion that the officer's use of deadly force was objectively reasonable under the Fourth Amendment. *Klum*, 2024 WL 2880620, at *12-13, n.5 (citing *Dunn v. Doe 1-22*, 670 F. Supp. 2d 735, 843 (S.D. Iowa 2023)).[15]

Under 28 U.S.C. § 1367(c)(3), the court has supplemental jurisdiction over state law claims that "form part of the same case or controversy" as the federal claims. *Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021). However, a district court may decide sua sponte not to exercise jurisdiction over remaining state law claims when all of the claims over which it has original jurisdiction have been dismissed. *Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006).

---

[14] The court did not recognize these claims because Iowa Code ch. 704 and § 804.8 do not support an independent claim and plaintiffs' amended petition failed to mention common law claims for assault and battery.

[15] In *Dunn*, the court applied emergency response immunity under Iowa Code § 670.4(1)(k) to each of the common law assault and battery claims. It is not clear whether plaintiffs alleged in that case that such common law claims were protected by the Iowa Constitution.

Case 6:23-cv-02057-LTS-MAR   Document 80   Filed 08/23/24   Page 23 of 25

The arguments and defenses related to plaintiffs' state law claims involve disputes over recent cases involving whether the Iowa Supreme Court would recognize such causes of actions and if so, whether certain immunities under Iowa law remain available. Given that all federal claims have been dismissed, I decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims, which are better addressed by the Iowa courts. *See Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990) (encouraging federal courts to exercise judicial restraint and avoid state law issues wherever possible recognizing the necessity to provide "great deference and comity to state court forums to decide issues involving state law questions."). Plaintiffs' remaining state law claims will be remanded to state court.

**B.    *Remaining Motions***

Because both defendants are entitled to summary judgment on the § 1983 claim and I have declined to exercise jurisdiction as to the remaining state law claims, plaintiffs' motion for partial summary judgment will be denied. Similarly, because I did not need to rely upon expert testimony or reports to enter summary judgment on the § 1983 claim, I find that the parties' motions to exclude expert testimony are moot and will therefore deny those motions without prejudice.

## VI.    CONCLUSION

For the reasons stated herein:

1.    Plaintiffs' motion (Doc. 61) for partial summary judgment is **denied**.

2.    Defendants' motion (Doc. 64) for summary judgment is **granted in part** and **denied in part**, as follows:

      a.    The motion is **granted** as to Count I (excessive force in violation of the Fourth Amendment to the United States Constitution), which is **dismissed with prejudice**. Judgment as to Count I **shall enter** in favor of defendants and against plaintiffs.

24

b.    The motion is **denied** as to all other claims. Those remaining claims are hereby **remanded** to the Iowa District Court for Black Hawk County.

3.    Plaintiffs' motion (Doc. 71) to strike defendants' expert testimony and defendants' motion (Doc. 75) to exclude plaintiffs' expert witness are both **denied without prejudice** as moot.

4.    Because this order disposes of all claims, the trial of this case in this court, currently scheduled to begin January 27, 2025, is hereby **canceled**. The Clerk of Court shall **close this case**.

**IT IS SO ORDERED** this 23rd day of August, 2024.

_____
Leonard T. Strand
United States District Judge